*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EBEN FORD,

        Plaintiff-Appellee,

and

KAIZEN CASE MANAGEMENT, L.L.C. and
LUCID NEUROLOGY, P.C.,

        Intervening Plaintiffs,

v

CITY OF DETROIT,

        Defendant-Appellant,

and

JIMMY BYNUM and DETROIT DEPARTMENT
OF TRANSPORTATION,[1]

        Defendants.

UNPUBLISHED
December 28, 2023

No. 363398
Wayne Circuit Court
LC No. 20-013478-NI

Before: GLEICHER, C.J., and GARRETT and MALDONADO, JJ.

PER CURIAM.

        This third-party negligence action involving a defense of governmental immunity arises from plaintiff Eben Ford's fall when riding one of defendant City of Detroit's busses. The trial court denied Detroit's motion for summary disposition, concluding that questions of fact existed

---

[1] Jimmy Bynum and Detroit Department of Transportation were dismissed from this case in the trial court and are not parties to this appeal.

-1-

regarding (1) "whether the bus driver created an unusual and sudden jerking of the bus, after it was at a stop," and (2) causation.

On appeal, Detroit argues that the trial court erred by denying its motion for summary disposition because (1) Detroit, along with its allegedly negligent employee bus driver, Jimmy Bynum, are shielded from liability by governmental immunity; and (2) Ford cannot establish the elements necessary to sustain his negligence claim. Under the motor vehicle exception to governmental immunity, MCL 691.1405, Ford had to create a genuine issue of material fact regarding whether Bynum operated the bus at issue negligently. Ford created questions of fact regarding Bynum's negligent operation of the bus, causation, and damages. We affirm.

## I.  BACKGROUND

According to Ford, he fell and was injured when the bus he was riding "came to a fast stop at the Rosa Parks [bus] terminal." He elaborated:

> Well, after we pulled into the bus terminal at the stop, [I] got up out of my seat, maybe stepped down two to three steps, about to the end of the rear door exit and held onto a [support] pole.

> The door hadn't opened so I was kind of thinking for a minute, I'm fixing to close up like I'm doing now to get off the bus *and the bus jerked off again*[,] and when it jerked off I tried to grab the pole and I missed it and I fell to my right side and hit about four or five chairs and then the floor. I was knocked unconscious. Somebody picked me up. I don't know how long I was out.

Ford clarified that "the bus jerked forward after it was stopped," after he got up from his seat, and while he stood waiting for the doors to open. "I had walked down to the floor and was waiting for the door to open. You know, as the majority of the people, you know, when you stop, you know, you get off and get out your chair and walk to the door." When the bus jerked and Ford fell, he was straightening out his clothes and not holding on to the support pole. Ford testified that he fell on his right side and hit his head when the bus jerked. Ford also stated that he asked Bynum "to call the officer so I could make a report," but Bynum "had no concern" and said he did not have the time.

Bynum, who was driving the bus at issue, could not independently recall Ford's fall, instead relying on an incident report to support his deposition testimony. According to the incident report prepared by Bynum's supervisor, Bynum

> stated [to a service inspector or dispatch] that [Ford], who was exiting the coach, mentioned that he fell and continued walking off. [Ford] did not give any indication that he needed medical attention. [Bynum] . . . boarded the [next] passengers and went [back] into service. [The service inspector] informed Bynum that he will be pulled [from service] per DDOT guidelines and receiving three violations[:] leaving the scene of an accident, failure to perform duties and careless workmanship.

The incident report elaborates, in Bynum's own words, that

[u]pon entry of [the Rosa Parks Transit Center] at 5:30 p.m., [Ford] claimed to have slipped on the coach. He said he was fine and okay and left the coach. At the [Rosa Parks Transit Center], a waiting crowd of passengers entered/boarded the coach. I called control and was instructed to pull over [the] coach at the [next stop], and I waited on the service inspector. I was taken to clinic then back in service to terminal [sic]. [Ford] claimed injury at [the Rosa Parks Transit Center] after my departure.

Additionally, Ford filed a police report the day after the incident, which states that the bus, after it stopped at the transit center and Ford moved to the doors, "lunged," causing Ford to fall and lose consciousness.

Bynum testified that that Ford fell at the transit center, but Bynum did not see or remember this himself. According to Bynum, he first learned of Ford's fall from the service inspector "a few minutes" after the fact, when the inspector pulled him from service. But Bynum was ultimately uncertain whether he contacted dispatch or dispatch contacted him about the fall. He denied at any point refusing Ford's alleged request that Bynum get help to file a report.

Bynum noted that signs on each bus instruct passengers to remain seated until the bus completely stops, though not everyone follows this direction. Bynum did not remember whether any passengers stood up before the bus fully stopped when Ford fell. Bynum also noted that he cannot open the doors until a bus is fully stopped, and he did not remember anyone waiting for the doors to open that day.

Ford was taken from the bus terminal to the hospital by ambulance, and he subsequently sought follow-up treatment for debilitating pain. Ford's post-accident medical records show he was treated for various issues after the fall.

Ford filed a complaint against Bynum, Detroit, and the Detroit Department of Transportation (DDOT). Ford first asserted one count of negligence or gross negligence against Bynum, one count of "motor vehicle ownership liability/respondent superior" against DDOT, and one count against Detroit for benefits under the no-fault act, MCL 500.3101, *et seq*. Ford also requested a declaratory judgment against Detroit to determine the applicability of the no-fault act to his claims, and for "[o]ther determinations, orders, and judgments necessary to fully adjudicate the rights of the parties." Bynum and DDOT were later dismissed.

Detroit moved for summary disposition pursuant to MCR 2.116(C)(7), (8), and (10), concerning only Ford's third-party negligence claim. Detroit argued that summary disposition was warranted under MCR 2.116(C)(7) because Detroit and its employees are protected by government immunity, and Bynum did not act negligently, let alone with the gross negligence needed to overcome governmental immunity. Summary disposition was additionally proper under MCR 2.116(C)(8) because Ford's complaint failed to state any claim of negligence against Detroit, rendering it legally insufficient on its face. Detroit argued further that summary disposition was warranted under MCR 2.116(C)(10) because Ford could not establish the elements of negligence necessary to sustain his claim, particularly breach, causation, and damages. Detroit primarily asserted that Ford provided no evidence of any negligent act on Bynum's part, but only that the bus jerked as it reached its destination. This was a normal incident of travel that could not be

attributed to any negligence of Bynum, Detroit argued, and Ford's theory of causation was too speculative for recovery.

The court disagreed, concluding that Ford's deposition testimony created a question of fact concerning "whether the bus driver created an unusual and sudden jerking of the bus, after it was at a stop." The court also concluded that Ford's testimony and medical records created a question of fact regarding causation. The court rejected Detroit's assertion of governmental immunity given the motor vehicle exception under MCL 691.1405. Therefore, the trial court denied Detroit's motion for summary disposition.

This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for summary disposition de novo. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "In reviewing a motion for summary disposition under MCR 2.116(C)(7), a court considers the affidavits, pleadings, and other documentary evidence presented by the parties and accepts the plaintiff's well-pleaded allegations as true, except those contradicted by documentary evidence." *McLean v Dearborn*, 302 Mich App 68, 72-73; 836 NW2d 916 (2013). The evidence submitted must be considered in the light most favorable to the nonmoving party. *Id*. at 73. "If the facts are not in dispute and reasonable minds could not differ concerning the legal effect of those facts, whether a claim is barred by immunity is a question for the court to decide as a matter of law." *Ray v Swager*, 321 Mich App 755, 761 n 1; 909 NW2d 917 (2017).

A motion under MCR 2.116(C)(8) tests the legal sufficiency of a claim based on the factual allegations in the complaint. *El-Khalil*, 504 Mich at 159. "When considering such a motion, a trial court must accept all factual allegations as true, deciding the motion on the pleadings alone." *Id*. at 160. "A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*. However, because Detroit's motion for summary disposition relied on documentary evidence beyond the pleadings, we analyze it under MCR 2.116(C)(10). See *Cary Investments, LLC v Mount Pleasant*, 342 Mich App 304, 312-313; 994 NW2d 802 (2022) ("[I]f a summary disposition motion based on MCR 2.116(C)(8) presented the trial court with evidence beyond the pleadings, we treat the motion as having been brought and decided under MCR 2.116(C)(10) . . . .").

A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *El-Khalil*, 504 Mich at 160. "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*.

A movant satisfies its burden under MCR 2.116(C)(10) by "submitting affirmative evidence that negates an essential element of the nonmoving party's claim, or by demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 7; 890 NW2d 344

(2016) (cleaned up). "[T]he nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted." *Id*. (citations omitted; quoting *Quinto v Cross and Peters Co*, 451 Mich 359, 362-363; 547 NW2d 314 (1996)).

## III. ANALYSIS

Detroit argues that the trial court should have granted Detroit's motion for summary disposition because Detroit and Bynum are protected by governmental immunity.

"As a general rule, a governmental agency is immune from tort liability when it is engaged in the exercise or discharge of a governmental function." *Wood v Detroit*, 323 Mich App 416, 419-420; 917 NW2d 709 (2018); see also MCL 691.1407(1). "In order to assert a viable claim against a governmental agency, a plaintiff must plead facts establishing that an exception to governmental immunity applies to his or her claim." *Id*. at 420. Here, Ford asserts that he has a viable claim against Detroit under the motor vehicle exception to governmental immunity, MCL 691.1405. MCL 691.1405 provides that "[g]overnmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is the owner . . . ."

Notably failing whatsoever to address this exception, Detroit does not dispute its status as a governmental agency, Bynum's status as an employee, or that it owned the bus at issue. Accordingly, Detroit is only protected by governmental immunity *if* Ford failed to create a question of fact concerning whether Bynum acted negligently, an issue we address below. See *Arnold v Detroit*, unpublished per curiam opinion of the Court of Appeals, issued September 21, 2023 (Docket No. 363833), p 4 ("Here, the parties do not dispute that [the] defendants are governmental agencies, that the bus driver . . . was an employee, and that [the] defendants owned the bus at issue. The disputed issue is whether the bus driver was negligent in the operation of the bus. To avoid [the] defendants' immunity, [the] plaintiff must create a jury question as to whether the bus driver negligently operated the bus."). Detroit is simply incorrect that Ford needed to establish that Bynum acted with gross negligence to overcome governmental immunity, and that his failure to do so warranted summary disposition under MCR 2.116(C)(7).

Detroit argues further that the trial court should have granted its motion for summary disposition because Ford cannot establish the elements necessary to sustain his negligence claim.

"To establish a prima facie case of negligence, a plaintiff must prove the following elements: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Anderson v Transdev Servs*, 341 Mich App 501, 508; 991 NW2d 230 (2022). Detroit does not dispute that Bynum owed Ford a duty as the operator of the bus.

As an initial matter, assuming that Bynum negligently operated the bus, questions of fact exist regarding causation and damages. Ford testified that the bus jerked while he waited for the doors to open, causing him to fall and suffer injuries. His testimony, along with the incident and

police report, support that Ford reported his fall to transit personnel—including Bynum—and police, and that he was treated at the hospital and experienced significant pain after the fall. Ford also submitted numerous post-accident medical records largely corroborating his version of events and showing various injuries and medical issues purportedly resulting from his fall.

Interpreting the evidence in Ford's favor, he sufficiently established that the bus jerking, if attributable to Bynum's negligence, caused him to fall and suffer damages. To the extent that Detroit criticizes Ford's credibility and conflicts in his evidence, these are issues for a fact-finder, not to be decided by this Court on a motion for summary disposition. See *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013) ("The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10)."). The key question, therefore, is whether Ford established sufficient facts to remove this case from the usual-incidents-of-travel doctrine and establish that the bus jerking constituted or was attributable to Bynum's negligence. Ford argues that Bynum was negligent by "suddenly" and "forcefully" "jerk[ing] the bus forward when it was already at the bus stop and while [Ford] and others were standing and preparing to exit the bus."

"The law in Michigan is clear that a plaintiff is not entitled to recover for injuries sustained as a result of the sudden stopping or acceleration of a bus or streetcar, absent other evidence of negligence in the operation of the vehicle, because these sudden movements are incidents of travel, which travelers must reasonably anticipate." *Anderson*, 341 Mich App at 511; see also *Ottinger v Detroit United R*, 166 Mich 106, 107; 131 NW 528 (1911) ("[A] train or street car may be started without waiting for a passenger to reach a seat after entering a vehicle, unless there is some special and apparent reason to the contrary.") (quotation marks and citation omitted).

In *Selman v Detroit*, 283 Mich 413, 420; 278 NW 112 (1938), the Michigan Supreme Court explained that "[s]udden jerks and jolts in the movement of railroad trains or street cars are generally accepted as among the usual incidents of travel which every passenger by experience has learned to expect to some extent." Not all "jerks or jolts" are "usual incidents of travel," however. In *Selman*, the Court declared that "the carrier may be held liable if the jerk or jolt is *unnecessarily* sudden or violent." *Id*. (emphasis added); see also *Getz v Detroit*, 372 Mich 98, 101-102; 125 NW2d 275 (1963). The Court continued, "And unusually sharp jerks or violent jolting, due to the negligent operation of the car or the negligent failure to properly maintain the track, has been viewed as imposing liability on the carrier for resulting injuries to the passenger." *Selman*, 283 Mich at 420; see also *Anderson*, 341 Mich App at 511 ("Liability can attach if the jerk or jolt is unnecessarily sudden or violent.").

In the early case of *Ottinger*, 166 Mich 106, the Michigan Supreme Court found insufficient evidence of negligence when the plaintiff was injured on a stopping streetcar, reasoning as follows:

> The evidence indicates that the plaintiff's equilibrium was lost by reason of the sudden slowing of the car for its stop. There is no evidence that justifies the belief that it *was an unusually sudden stop*, or that there was any reason for plaintiff's falling, but her momentum, which naturally impelled her forward as the car slowed down, and that happens to a greater or less degree every time a car is

stopped. No one else in the car seems to have suffered from it. In case of necessity, a motorman must stop his car as speedily as possible, for the unforeseen is ever confronting him. Sudden stops are one of the ordinary conditions of trolley travel and are to be expected and guarded against by the passengers. The motorman cannot know what his passengers are doing and whether they are standing or walking in the car or not, and he must devote his attention to the management of his car in the ordinary way. [*Id*. at 108-109 (emphasis added).]

Later, in *Getz*, 372 Mich 98, the plaintiff "relied, for a showing of [the] defendant's negligence, on her testimony that when the bus started it jerked twice," causing her to fall backwards. *Id*. at 101. The Michigan Supreme Court concluded that evidence of negligence was lacking because "there was no showing that the jerk, jolt or jar 'was unnecessarily sudden or violent.' " *Id*. at 102. The Court explicitly distinguished the facts from a separate case where "the bus suddenly swerved to the left and stopped abruptly," and "there were proofs of excessive speed, repeated lurching of the bus from side to side and of following another vehicle too closely." *Id*. at 101.

In *Adelsperger v Detroit*, 248 Mich 399; 227 NW 694 (1929), the Michigan Supreme Court found a triable case of negligence under the following facts:

[The p]laintiff was a passenger for hire in a motor bus of [the] defendant on one of its streets. Seats of the bus were occupied and [the] plaintiff was standing, holding a hand-rail above. Overtaking a Ford car, the driver of the bus sought to pass and was not accommodated. Continuing his effort to pass for nearly three blocks, the driver became angry. There is evidence that the bus moved at excessive and unlawful speed, 30 to 35 miles per hour; that it swayed; that it was very close to the Ford car, as close as five feet; that passengers protested and frequently sounded the buzzer; and that a movement of the Ford toward an intersecting street caused the driver of the bus to make sudden application of brakes and a sudden turn of the steering wheel. [The driver] testified:

"I knew from the suddenness of my stop and jamming on of both brakes and the suddenness with which I twisted the wheel that if passengers were standing in the aisle, they would possibly be propelled forward or fall or something [would] happen to them, if they were not hanging on."

[The p]laintiff fell, and there is evidence that she suffered serious and permanent injuries. [*Id*. at 401-402.]

Admittedly, this case does not involve any additional evidence of negligence like that deemed important in *Getz* and *Adelsperger*, like swerving, repeated lurching, excessive speed, or following another vehicle too closely, although Ford did report to police that the bus "lurched" when he fell. And like in *Ottenger*, there is no evidence of any other passengers falling or being injured by the bus's movement. Ford's unpublished case *Cole v Darryl L. Bland & Jackson Area Trans Auth*, unpublished per curiam opinion of the Court of Appeals, issued March 17, 2020 (Docket No. 347034), which found a question of fact regarding a driver's negligence in stopping a bus, unpub op at 5, is also factually dissimilar. The Court in *Cole* determined that "a reasonable

jury could conclude that [the driver] did not make reasonable allowances for traffic and that [the driver]'s application of the brakes created a sudden and unnecessary jolt . . ." *Id*. at 4. There was evidence that the bus was traveling between 15 to 20 miles per hour "in the through-traffic area of [a] parking lot," it decelerated "somewhat forcefully" to stop behind a vehicle waiting at a stop sign, and the Court emphasized the plaintiff's "limited mobility and lack of seating." *Id*. The bus's speed when approaching another vehicle in a parking area and the plaintiff's vulnerable position in *Cole* were arguably important facts in the Court's decision, none of which exist here.

Nevertheless, this case is unique given evidence that the bus jerked *after* initially stopping at the bus terminal and as Ford and others waited at the doors to exit. Ford testified that "the bus jerked forward after it was stopped" and he got up from his seat, while he stood waiting for the doors to open. He argues that the "particularly violent and sudden" jerk after the bus initially stopped distinguishes the facts from a typical stop-and-start case, and is sufficient proof of Bynum's negligence. Although this is a close case, we agree. Construing the evidence in Ford's favor, the bus reached the transit center and stopped, and did not jerk until Ford had left his seat and waited—for at least enough time that he "was thinking for a minute" and released the support pole to straighten his clothes—for the doors to open. These facts suffice to show circumstantially that the jerk was unnecessarily sudden and unpredictable rather than a "normal incident of travel." While passengers might "expect[] and guard[] against" repeated jerks while a bus is traveling or during a normal stop or start, the same is not true when a bus, like that here, unexpectedly jerks after fully stopping at its destination, and after enough time for patrons to get up and move to the doors. See *Ottinger*, 166 Mich at 109. As such, Detroit's reliance on *Gnatt v SMART*, unpublished per curiam opinion of the Court of Appeals, issued December 18, 2003 (Docket Nos. 241237 and 243284), which involved only a single sudden stop at a bus stop "without any . . . additional direct or circumstantial evidence of negligence," *id*. at 3, is unavailing.

To the extent that Detroit faults Ford for standing up before the bus completely stopped,[2] accepting this as fact would entail a factual determination inappropriate for this Court when ruling on a motion for summary disposition. Indeed, while Detroit emphasizes warnings against passengers standing until the bus is fully stopped, this is—critically—exactly what Ford testified he did. Because questions of fact exist regarding the applicability of the normal-incidents-of-travel doctrine and whether Bynum negligently operated the bus by jerking it after already coming to a stop at the transit center, summary disposition was properly denied.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Kristina Robinson Garrett
/s/ Allie Greenleaf Maldonado

---

[2] Detroit also faults Ford for relinquishing the support pole before his fall, which we deem irrelevant given Ford's testimony that the bus was already stopped and he was merely waiting for the doors to open.